UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Case No. 5:16-85-DCR-CJS-2 |
| | ) | Civil Case No. 5:23-244-DCR-CJS |
| v. | ) | |
| | ) | |
| WESLEY SCOTT HAMM, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

Wesley Hamm, proceeding *pro se*, has filed a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence. (R. 314). The Government filed a Response (R. 317), and Hamm filed a Reply. (R. 321). Pursuant to local practice, this matter has been referred to the undersigned for the preparation of a Report and Recommendation under 28 U.S.C. § 636(b). For the reasons set forth below, it will be recommended that Hamm's § 2255 Motion **be denied**.

## I.    FACTUAL AND PROCEDURAL HISTORY

The factual circumstances giving rise to Hamm's convictions were detailed by the Sixth Circuit in Hamm's direct appeal:

> On August 24, 2016, . . . Wesley Hamm, his wife Jennifer Hamm, and their friend Matt Jones traveled from Mt. Sterling, Kentucky to Cincinnati, Ohio to purchase drugs from . . . Robert Shields. Hamm used money provided to him by his roommate and local drug dealer, Tracey Myers, to purchase what he thought was fentanyl. On their way back to Mt. Sterling, the Hamms and Jones ingested some of the purchased drugs. Neither Hamm nor Jennifer experienced any adverse effects, but Jones immediately became incoherent and unresponsive. Ultimately, however, Jones did not require medical attention and was able to drive himself home a few hours later.

> Upon returning to Mt. Sterling, Hamm kept some of the drugs for himself and gave the rest to Myers. Later that evening, Myers sold drugs to a man we will call L.K.W. Within hours, L.K.W. overdosed and died. It is undisputed that L.K.W.

died as a result of ingesting carfentanil supplied to him by Myers. Carfentanil, a synthetic opioid is similar in action to other opioids like fentanyl and morphine (a major component in heroin) but it is much more potent.  At the first trial, the medical examiner testified that carfentanil was about "10,000 times stronger than morphine."

Law-enforcement officers traced the drugs back to Myers, who confessed to having sold what she believed was heroin or fentanyl to L.K.W. Myers was arrested for drug trafficking. Police also arrested Hamm on outstanding warrants. Hamm admitted to buying what he believed to be fentanyl on August 24, 2016, and he identified Shields as his supplier. Investigators arranged a controlled buy between Hamm and Shields, and they arrested Shields upon his arrival. Shields admitted to having sold fentanyl on several occasions.

Following her arrest, Myers smuggled drugs into the Montgomery County Jail. There, she provided these drugs to three of her female cellmates. All three women overdosed, but because jail personnel were able to promptly administer naloxone, each survived. Naloxone is a medication that can temporarily reverse the effects of an opioid overdose. The women tested positive for carfentanil. Myers committed suicide one week later.

*United States v. Hamm*, Nos. 21-6165/6186, 2023 WL 3244975, at *1 (6th Cir. May 4, 2023) (citations omitted).

Hamm and Shields were initially charged by way of Criminal Complaints with conspiracy to distribute fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 846.  (*See* R. 1).  The Court determined there was probable cause to believe Hamm and Shields committed the alleged crime and bound the matter over to the grand jury.  (*See* R. 7; R. 8).  The federal grand jury ultimately returned a Third Superseding Indictment on May 4, 2017, charging Hamm and Shields with conspiracy to distribute carfentanil, fentanyl, and heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1), distribution of carfentanil, the use of which resulted in the overdose death of L.K.W. in violation of 21 U.S.C. § 841(a)(1) (Count 2), and distribution of carfentanil, the use of which

resulted in serious bodily injury of Myers's three cellmates in violation of 21 U.S.C. § 841(a)(1) (Count 3).[1]  (*See* R. 86).

On July 13, 2017, a jury convicted Hamm and Shields of conspiracy to distribute carfentanil, fentanyl, and heroin (Count 1), distribution of carfentanil the use of which resulted in the death of L.K.W. (Count 2), and distribution of carfentanil the use of which resulted in serious bodily injury to Myers's three cellmates (Count 3).  (*See* R. 127).[2]  The guilty verdict on Counts 2 and 3 triggered a statutory minimum sentence of 20 years for Hamm and a mandatory life sentence for Shields (who had a prior felony drug conviction).  *See* 21 U.S.C. § 841(b)(1)(C). Hamm was sentenced to a total term of imprisonment of 420 months (35 years) and Shields was sentenced to life.  (*See* R. 161).

On direct appeal, the Sixth Circuit affirmed the convictions, finding that there was sufficient evidence to support each count, but vacated the sentences and remanded.  *United States v. Hamm*, 952 F.3d 728, 736-40 (6th Cir. 2020).  The Circuit found that the jury instructions omitted necessary language limiting § 841(b)(1)(C)'s death-or-injury enhancement to defendants who were "'part of the distribution chain' to the overdose victim."  *Id.* at 741 (quoting *United States v. Swiney*, 203 F.3d 397, 406 (6th Cir. 2000)).  That is, "the jury could not use a *Pinkerton*[3] theory to apply § 841(b)(1)(C)'s death-or-injury enhancement."  *Id.*  Rather, "[t]o apply the § 841(b)(1)(C) sentencing enhancement to the distribution convictions, the jury needed to find beyond a reasonable doubt that Hamm and Shields were part of the distribution chain to L.K.W.

---

[1] The Third Superseding Indictment also charged Hamm's wife, Jennifer, with conspiracy to distribute carfentanil, fentanyl, and heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1).

[2] Jennifer Hamm pleaded guilty to conspiracy to distribute carfentanil, fentanyl, and heroin (Count 1) pursuant to a written Plea Agreement (R. 108) and was sentenced to a term of imprisonment for 23 months (*see* R. 149; R. 152).

[3] *Pinkerton v. United States*, 328 U.S. 640 (1946).

and Myers's cellmates." *Id*. at 747. Therefore, the Circuit remanded "for a new trial on the sole question of whether to apply the 21 U.S.C. § 841(b)(1)(C) sentencing enhancement on Counts 2 and 3." *Id*. at 748.

On remand, the United States sought the § 841(b)(1)(C) sentencing enhancement only for the death of L.K.W. (Count 2); it did not seek the enhancement for the serious bodily injury suffered by Myers's three cellmates (Count 3). (*See* R. 235 at Page ID 1875). At trial, the Court explained to the jury that its role was only to decide whether Shields and Hamm were in the distribution chain for the same carfentanil that led to L.K.W.'s death. (*See* R. 262; R. 303). The jury ultimately found that Hamm and Shields were within the chain of distribution and returned a verdict applying the death-or-injury enhancement. (R. 265; R. 266). The United States did not seek mandatory life imprisonment with respect to Shields (*see* R. 269), and he was sentenced to a term of imprisonment of 480 months (40 years), followed by a 6-year term of supervised release (*see* R. 280). Hamm was sentenced to a term of imprisonment of 480 months (40 years), followed by a 3-year term of supervised release. (*See* R. 281).

Hamm and Shields appealed, arguing that there was insufficient evidence to support the jury's application of the death-or-injury enhancement and that the jury instructions on the death-or-injury enhancement misstated the law. (R. 282; R. 284). The Sixth Circuit disagreed and affirmed on May 4, 2023. (R. 310); *United States v. Hamm*, Nos. 21-6165/6186, 2023 WL 3244975 (6th Cir. May 4, 2023). With respect to the sufficiency of the evidence supporting the death-or-injury enhancement, the Circuit found (1) that a reasonable jury could have concluded that the evidence presented at trial credibly explained the Hamms's differing reactions to the drugs purchased from Shields; (2) that a reasonable jury could have considered Jones's reaction to the drugs purchased from Shields as evidence of the fact that the drugs distributed by Shields and

Hamm were the same drugs Myers distributed to L.K.W.; and (3) that a reasonable jury could find that, although Myers did have other sources of supply, Myers did not distribute drugs sourced from any other supplier on August 24, 2016, and that the drugs Myers sold to L.K.W. were the same drugs distributed by Shields and Hamm. *See* 2023 WL 3244975, at *3-4. With respect to the jury instructions, the Circuit found (1) that the jury instruction for the death-or-injury enhancement accurately stated the law, (2) that the jury was permitted in the first trial to find Hamm and Shields guilty of distribution by finding that *either* Hamm and Shields personally distributed carfentanil *or* that they were vicariously liable for Myers's distribution under *Pinkerton*, and (3) that contrary to Defendants' assertions that the jury was left with "no choice" but to apply the enhancement, the jury could have accepted Hamm's and Shields's theory of the case and found that Defendants were outside the chain of distribution. *See id*. at *5-6.[4]

On August 22, 2023, Hamm filed the instant § 2255 Motion. (R. 314). The United States filed a Response (R. 319), attaching exhibits of a Kentucky State Police ("KSP") Report by Sergeant Jimmy Daniels (R. 319-1) and a Drug Enforcement Agency ("DEA") Report by Agent Jared Sullivan (R. 319-2). Hamm then filed a Reply. (R. 321). Hamm's § 2255 Motion is now ripe, and his grounds for relief are addressed below.

## II.    ANALYSIS

### A.    Governing Legal Standard

Under 28 U.S.C. § 2255(a), a federal prisoner may seek relief on grounds that: his conviction or sentence violated the Constitution or laws of the United States; the court lacked jurisdiction to impose the sentence; the sentence exceeded the maximum authorized by law; or the

---

[4] Shields also argued that the district court erred in denying his motion for severance and for a mistrial following the admission of testimony concerning Hamm's efforts to tamper with witnesses. The Sixth Circuit disagreed and affirmed. *See Hamm*, 2023 WL 3244975, at *6-9.

sentence is otherwise subject to collateral attack. To succeed on a § 2255 motion alleging constitutional error, a federal prisoner "must establish an error of constitutional magnitude which had a substantial and injurious effect or influence on the proceedings." *Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1999) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)). To obtain relief for a non-constitutional error, a federal prisoner "must establish a 'fundamental defect which inherently results in a complete miscarriage of justice,' or, an error so egregious that it amounts to a violation of due process." *Id.* (quoting *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990)). In sum, a federal prisoner must allege in his § 2255 motion that: (1) his conviction was the result of an error of constitutional magnitude; (2) his sentence was imposed outside of statutory limits; or (3) there was an error of law or fact so fundamental as to render the proceedings invalid. *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006) (citing *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)). A federal prisoner must prove his allegations by a preponderance of the evidence. *Id.* at 964.

### B.    Hamm's Grounds for Relief

Hamm raises six grounds for relief. (*See* R. 314).[5] First, Hamm argues his counsel provided ineffective assistance in two instances: when he conceded that Hamm was guilty of distributing controlled substances; and when he filed the second appeal without Hamm's participation. (*See id*. at Page ID 2876). Second, Hamm asserts that his Fourth Amendment rights were violated when law enforcement entered his residence without a warrant and under the false pretenses of a welfare check. (*See id*. at Page ID 2877). Third, Hamm argues evidence of

---

[5] Hamm purports to raise the following eight grounds for relief: (1) ineffective assistance of counsel, (2) illegal search and seizure, (3) inadmissible evidence at trial, (4) cruel and unusual punishment, (5) improper jury instructions, (6) improper sentence, (7) forced trial, and (8) cruel and unusual punishment. (*See* R. 314 at Page ID 2889-93; *see also id*. at Page ID 2876-83). There is considerable overlap between the substance of Hamm's purported grounds 4, 6, and 8, all of which deal with the reasonableness of his sentence. Therefore, the Court addresses those claims together.

controlled buys that did not involve him and that occurred outside the date range of the charges in the Third Superseding Indictment was improperly admitted at trial. (*See id*. at Page ID 2879). Fourth, Hamm challenges the reasonableness of his sentence. (*See id*. at Page ID 2880, 2882-83). Fifth, Hamm takes issue with the jury instructions provided at his second trial. (*See id*. at Page ID 2881). Sixth, Hamm argues that the prosecution never offered him a plea that did not include cooperating against his co-defendants, and he was therefore forced into going to trial. (*See id*. at Page ID 2882).

As discussed below, Hamm's grounds for relief are not cognizable on collateral review, are procedurally defaulted, were rejected on direct appeal, or otherwise lack merit. Therefore, it will be recommended that Hamm's § 2255 Motion be denied. Each ground for relief will be addressed in turn.

### 1.     Ground One – Ineffective Assistance of Counsel

When assessing an ineffective assistance of counsel claim, the Court must consider "whether counsel's conduct so undermined the proper function of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To establish he has been deprived of effective assistance, a defendant must show that counsel's performance was both constitutionally deficient and prejudicial. *Id.*

To prove deficient performance, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. A defendant meets this burden by showing "that counsel's representation fell below an objective standard of reasonableness" as measured by "prevailing professional norms . . . considering all the circumstances." *Id*. at 688. Judicial scrutiny of counsel's performance, however, is "highly deferential," consisting of a "strong presumption that counsel's conduct falls

within the wide range of reasonable professional assistance." *Id.* at 689.  When assessing counsel's performance, the Court must make "every effort . . . to eliminate the distorting effects of hindsight . . . and to evaluate the conduct from counsel's perspective at the time."  *Id.*

To prove prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*  Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  *Id.* at 691.

In his first ground for relief, Hamm asserts that his court-appointed counsel, Jeffrey Darling, was ineffective in two ways: first, by conceding at trial that Hamm was guilty of the distribution offenses; and second, by filing the second appeal without Hamm's knowledge.  (*See* R. 314 at Page ID 2876, 2889-90).[6]

### a.    Conceding Guilt at Trial

Hamm claims he told his counsel his "side and the truth of the events that day," but that Attorney Darling "refused to use that as the defense" and instead told the jury that Hamm "was in fact distributing drugs, just not the drugs being alleged."  (R. 314-2 at Page ID 2889).  According to Hamm, he "obviously couldn't have fairly been defended when [his] counsel told the jury [he] was guilty of the very thing [he was] being tried for (conspiracy to distribute a controlled substance)."  (*Id.*).

---

[6] Attorney Darling represented Hamm at the first and second trial, as well as both sentencings, and the appeal of the second trial.  (*See, e.g.*, R. 283).  Attorney Michael Losavio was appointed by the Sixth Circuit to represent Hamm on appeal of the first trial.  (*See* R. 167; R. 168).

Hamm does not clarify whether he is challenging his counsel's conduct at the first or second trial. To the extent Hamm is targeting his counsel's conduct during the second trial, Hamm's argument misses the mark. On direct appeal from the first trial, the Sixth Circuit reviewed the sufficiency of the Government's evidence and affirmed Hamm's convictions on all counts. *See Hamm*, 952 F.3d at 736-40. Indeed, the Sixth Circuit even found there was sufficient evidence to sustain the sentencing enhancement on Count 2. *See id*. at 748. The Circuit reversed because the jury instructions utilized *Pinkerton* liability for purposes of applying the sentencing enhancements and therefore misstated the law. *See id*. The Circuit remanded "for a new trial *on the sole question* of whether to apply the 21 U.S.C. § 841(b)(1)(C) sentencing enhancement on Counts 2 and 3." *Id*. (emphasis added).

Contrary to Hamm's understanding, "the very thing" he was "being tried for" on remand was the sentencing enhancement, not the substantive distribution offenses. In fact, Hamm acknowledges that he "was granted a new trial solely on the death enhancement." (R. 314-2 at Page ID 2892). Limited by the Sixth Circuit's remand, Attorney Darling was precluded from relitigating the substance of the distribution offenses. *United States v. Campbell*, 168 F.3d 263, 265 (6th Cir. 1999) ("Limited remands explicitly outline the issues to be addressed by the district court and create a narrow framework within which the district court must operate. . . . In essence, the mandate rule is a specific application of the law-of-the-case doctrine."); *Edmonds v. Smith*, 922 F.3d 737, 739 (6th Cir. 2019) (noting that under the law-of-the-case doctrine, "findings made at one stage in the litigation should not be reconsidered at subsequent stages of that same litigation"). Thus, the only reasonable strategy (arguably the only *permissible* strategy given the limited remand) was for Attorney Darling to contest Hamm's part in the chain of distribution

leading to L.K.W.'s death. And that is precisely what Attorney Darling did. Indeed, the jury was instructed that Hamm's position was as follows:

> It is the position of the defendants that the carfentanil distributed by Tracey Myers to [L.K.W.] on or about August 24, 2016, was not the same carfentanil distributed by Shields and Hamm on or about that same date. The defendants claim that Tracey Myers had alternative sources of supply and mixed the substance obtained from the defendants with other unknown substances that may have included other carfentanil. Thus, the defendants claim that the drugs that led to [L.K.W.'s] death were different than the substances distributed by the defendants.

(R. 262 at Page ID 2017; R. 303 at Page ID 2689). And during closing argument, Attorney Darling asserted that "in order to find the chain, the link between Hamm and Myers of the drugs that killed [L.K.W.]," the jury would have to engage "in rank speculation" because "there is no proof." (R. 303 at Page ID 2744).

During closing arguments, Attorney Darling did reference the fact that Hamm had been convicted for distribution of controlled substances. (*See id*. at Page ID 2748) ("Wes Hamm and Robert Shields have been convicted of very serious drug offenses and will do a significant amount of time. The issue in this case is whether the government has proved to you beyond a reasonable doubt that it's the same drugs that killed [L.K.W.] that Mr. Shields sold to Wes Hamm earlier that day."). In its Response to Hamm's § 2255 Motion, the Government notes the potential applicability of *McCoy v. Louisiana*, 584 U.S. 414 (2018), but argues that *McCoy* should not apply under the circumstances. (*See* R. 319 at Page ID 2914 n.*) ("This unique situation involving a second trial with a narrow scope does not appear to implicate the requirement in *McCoy v. Louisiana*, [584 U.S. 414] (2018), that an attorney must obtain his client's consent prior to conceding guilt during trial when the defendant maintains his innocence to the charged conduct."). "*McCoy* held that the Sixth Amendment gives a defendant the right to insist that counsel refrain from admitting guilt over the defendant's objection, even when counsel believes that it is in the

defendant's best interest to concede guilt to avoid a harsh sentence." *Hood v. Buchanan*, No. 19-3502, 2019 WL 6445407, at *2 (6th Cir. Oct. 3, 2019) (citing *McCoy*, 584 U.S. at 426-28). Denial of this right constitutes structural error such that a defendant need not show prejudice under *Strickland*. *See McCoy*, 584 U.S. at 427; *see also Forrest v. United States*, No. 21-4226, 2022 WL 18144102, at *2 (6th Cir. July 12, 2022).

The Government's argument is correct. When viewed in the proper context, Attorney Darling's reference to the prior convictions does not constitute a concession of guilt. Hamm's guilt on the conspiracy and distribution charges had already been determined via the first trial and affirmed by the Sixth Circuit. As noted previously, the parties and the Court were bound by the law of the case and Hamm was precluded from relitigating his guilt on those charges. In other words, Attorney Darling did not *concede* anything on remand with respect to the underlying convictions because the District Court (and the Sixth Circuit) had already determined his guilt. Rather, Attorney Darling argued on remand that Hamm was not guilty of the sentencing enhancement, i.e., the only issue before the jury. Indeed, the distinction between the substantive distribution offenses and the sentencing enhancement was the primary reason for the Sixth Circuit's decision in the first place. *See Hamm*, 952 F.3d at 747 n.10 (internal quotations omitted) ("In future cases involving the death-or-injury enhancement, we encourage the government and district courts to consider using separate counts, special verdict forms, or more specific instructions to make clear to juries the distinction between the substantive offenses and the death-or-injury enhancement, and the differing applicability of *Pinkerton* and *Swiney* to each."). To this end, it was a reasonable strategy for Attorney Darling to emphasize the limited issue before the jury by taking Hamm's prior convictions out of the equation. Thus, Hamm has failed to demonstrate that Attorney Darling's performance at the second trial was constitutionally deficient.

To the extent Hamm is targeting his counsel's conduct at the *first* trial, that argument similarly fails. According to Hamm, Attorney Darling admitted at the first trial that Hamm distributed "a" controlled substance but argued it was a different substance from the carfentanil that caused the death of L.K.W. and the injuries to Myers's three cellmates. (R. 321 at Page ID 2947). At some points in closing argument at the first trial, Attorney Darling made statements that could reasonably be interpreted as conceding that Hamm did in fact purchase controlled substances from Shields. (*See* R. 139 at Page ID 1273-74, 1277, 1279). In doing so, Attorney Darling focused on the argument that the Government failed to prove beyond a reasonable doubt that the controlled substances Hamm purchased from Shields contained the same carfentanil that caused the death of L.K.W. and the injuries to Myers's three cellmates. (*See id.*; *see also id.* at Page ID 1268 ("I have concentrated on two things; the death of [L.K.W.], and the serious injury suffered by [Myers's three cellmates].")).

Attorney Darling's argument does not constitute a concession of guilt under *McCoy*. The Sixth Circuit has found that counsel's concession as to one essential element of a crime does not constitute a concession of guilt under *McCoy*, particularly when the concession leaves open a defensive strategy as to another essential element. *See Davis v. United States*, No. 22-5920, 2023 WL 3294535, at *3 (6th Cir. Apr. 10, 2023) ("But here, Davis's attorney did not admit that Davis was guilty of [the crime]. Instead, she conceded only one essential element of the crime . . . which . . . left intact his defense on another essential element of the crime. . . . Consequently, Davis did not establish a *McCoy* violation.") (citing *Thompson v. United States*, 826 F. App'x 721, 727-28 (11th Cir. 2020) (Siler, J., sitting by designation)). So too here. At the first trial, the jury was instructed that whether L.K.W.'s death and the cellmates' injuries resulted from Hamm's distribution was, in effect, an element of the distribution offenses. (*See* R. 124 at Page ID 586-

12

91); *see also Hamm*, 955 F.3d at 743-44 (noting that the indictment and jury instructions "listed the sentencing provision as if it were an element of the substantive offense").[7]  At most, then, Attorney Darling perhaps conceded guilt as to a single portion of one essential element of the distribution charges—that Hamm purchased fentanyl from Shields.   But Attorney Darling emphasized Hamm's innocence on a different essential element—that Hamm did not distribute the same carfentanil that resulted in L.K.W.'s death and the cellmates' injuries.   Thus, Attorney Darling's concession during closing argument that Hamm did in fact purchase controlled substances from Shields does not constitute a concession of guilt under *McCoy* given that Attorney Darling maintained Hamm's innocence as to whether the controlled substance contained the same carfentanil that resulted in the death of L.K.W. and serious injuries to the three cellmates.  *Davis*, 2023 WL 3294533, at *3.

Moreover, Hamm has failed to demonstrate that Attorney Darling's strategy at the first trial was objectively unreasonable.   Hamm maintains that whether he was distributing "the 'same carfentanil' is irrelevant" because it was his position that he "did not distribute <u>any</u> controlled substances."  (R. 321 at Page ID 2947-48) (emphasis in original).   But Hamm does not explain how it would have been reasonable for Attorney Darling to take that position.   Whether the same carfentanil was exchanged between Hamm and Myers is the operative question to determine whether the sentencing enhancement applied pursuant to 21 U.S.C. § 841(b)(1)(C).   "The statute requires the government to prove only that the specific drug underlying a defendant's violation of § 841(a)(1) is *the same drug* that was the but-for cause of the victim's death."  *United States v.*

---

[7] Hamm has not argued that Attorney Darling was ineffective for failing to object to the jury instructions provided at the first trial.  Nor could he.  Attorney Darling objected to the *Pinkerton* instruction on Counts 2 and 3.  (*See* R. 120; R. 121; R. 138 at Page ID 1230).  In addition, Attorney Darling asserted during his closing argument that the instructions misstated the law (the Government's objection to this assertion was sustained).  (*See* R. 139 at Page ID 1276-77).

*Davis*, 970 F.3d 650, 656 (6th Cir. 2020) (emphasis added).  Put differently, "[t]he text [of 21 U.S.C. § 841(b)(1)(C)] requires only that the defendant have a connection to the death-causing drugs, not to the deceased person."  *Id*.  Thus, whether Hamm distributed the "same carfentanil" that resulted in L.K.W.'s death is extremely relevant to determining whether § 841(b)(1)(C) applies.  And as noted previously, whether Hamm distributed the same carfentanil that resulted in L.K.W.'s death was effectively treated as an element at Hamm's first trial.  *Hamm*, 955 F.3d at 743-44.

In addition, the Government produced overwhelming evidence that Hamm did in fact distribute at least one controlled substance—fentanyl.  Significantly, the Government elicited testimony from Hamm's co-defendant and wife, Jennifer.  She testified that she and her husband (and sometimes Myers) traveled together almost daily in order to purchase fentanyl from Shields, that they would use some of the fentanyl, and that Myers would then sell the fentanyl to other drug users within the Mt. Sterling community.  (*See* R. 137 at Page ID 932-36).  Jennifer also testified that she and her husband, along with Matt Jones, travelled to purchase fentanyl from Shields just two days before L.K.W.'s overdose.  (*See id*. at Page ID 937-38).  Jennifer admitted to recording a video of the return trip, which video showed Matt Jones having a significant reaction to the fentanyl just purchased and which video was admitted and shown to the jury.  (*See id*. at Page ID 938-39; *see also* R. 136 at Page ID 754-55).  Most importantly, the Government elicited testimony from DEA Agent Jared Sullivan about *Hamm's own admissions*.  Hamm admitted in an interview with law enforcement that he purchased four or five grams of fentanyl on behalf of Myers the day before the overdoses, personally used some of the substance, and then gave the remainder to Myers.  (*See id*. at Page ID 832-33; *see also* R. 319-2 at Page ID 2937).  Faced with such damning evidence, Attorney Darling's strategy to attack the chain of distribution involving the carfentanil

was a reasonable one.  If successful, he had the potential to significantly reduce Hamm's sentence by subjecting him to a statutory maximum of 20 years, as opposed to a 20-year statutory minimum. *See* 21 U.S.C. § 841(b)(1)(C)).  Thus, Attorney Darling's performance at the first trial was objectively reasonable under the circumstances.

Even if conceding one essential element of a crime constitutes a concession of guilt under *McCoy*, and assuming *arguendo* that Attorney Darling's strategy was objectively unreasonable, Hamm has failed to demonstrate that prejudice should be presumed under *McCoy*.  In *McCoy*, the Supreme Court noted that McCoy "vociferously" opposed his counsel's concession of guilt "at every opportunity, before and during trial, both in conference with his lawyer and in open court." *McCoy*, 584 U.S. at 417, 424.  Thus, the Court held that "[w]hen a client *expressly asserts* that the objective of his defense is to maintain his innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt."  *Id*. at 423 (emphasis added) (internal quotations omitted); *see id*. at 424 ("Presented with *express statements* of the client's will to maintain innocence, however, counsel may not steer the ship the other way.") (emphasis added). Hamm argues that by merely pleading "not guilty" at his initial arraignment, he expressly asserted to his counsel that the objective of his defense was to maintain his innocence of the charged criminal acts.  (*See* R. 314-2 at Page ID 2889; R. 321 at Page ID 2946).  That is insufficient to trigger *McCoy*, particularly after Hamm made admissions to law enforcement to the contrary.  *See Forrest v. United States*, No. 21-4226, 2022 WL 18144102, at *3 (6th Cir. July 12, 2022) (denying § 2255 movant's application for certificate of appealability based on *McCoy* because movant failed to express his objection pretrial or at trial, and instead "expressed dissatisfaction with trial counsel only after the jury convicted him of all counts"); *see McCoy*, 584 U.S. at 428 ("Once [McCoy] communicated [his innocence] to court and counsel, strenuously objecting to [his attorney's]

proposed strategy, a concession of guilt should have been off the table."). In fact, Hamm's sixth ground for relief is that the Government never made a plea offer that did not require cooperating against his co-defendants. (*See* R. 314 at Page ID 2882). In other words, Hamm acknowledges that he was willing to admit his guilt in return for a potentially lower sentence. Notably, Hamm did not at the time express an objection to his counsel's strategy to procure a lower sentence. His current dissatisfaction comes only after he was convicted by the jury. *Forrest*, 2022 WL 18144102, at *3. Put simply, Hamm has failed to demonstrate that prejudice should be presumed under *McCoy*.

Finally, in light of the overwhelming evidence as to guilt, including Hamm's admissions as described above, Hamm has failed to make the normal showing of prejudice under *Strickland*. That is, Hamm has not demonstrated a reasonable probability that, but for his counsel's alleged error, the outcome of the trial would have been different. Therefore, Hamm is not entitled to relief on this ground.

### b.    Filing of Second Appeal

Next, Hamm claims that his counsel filed the second appeal without his knowledge. (*See* R. 314-2 at Page ID 2889-90). According to Hamm, Attorney Darling clarified following the first sentencing that he does not handle appeals; hence, Michael Losavio was appointed as appellant counsel for the first appeal. (*See* R. 321 at Page ID 2948). Hamm claims that at the conclusion of the second sentencing, Attorney Darling told him that the same process would occur. (*See id.* at Page ID 2949). Hamm states that after a "troubling stretch of time without any notice," he contacted Mr. Losavio and learned that Mr. Losavio had not been appointed but that there had been activity in his case. (*Id.*). Hamm claims he then called Attorney Darling's office to check if an appellate attorney had been appointed but did not reach Attorney Darling and had to leave a

voicemail. (*See id*.). Although Hamm does not specify the "troubling stretch of time" he waited before calling Mr. Losavio, he does state that he called Attorney Darling's office "[a]bout 14 months after [his] sentencing." (R. 314-2 at Page ID 2889).

Hamm claims that he received a follow-up letter from Attorney Darling about 25 days after his appeal had been denied. (*See* R. 321 at Page ID 2950). In his initial § 2255 Motion, Hamm claimed that he received a single-page letter from Attorney Darling's office. (*See* R. 314-2 at Page ID 2889-90). Hamm attached the single-page letter to his § 2255 Motion, which letter is dated May 26, 2023. (*See id*. at Page 2888). In his Reply, Hamm informs that he actually received a five-page letter from Attorney Darling's office. (*See* R. 321 at Page ID 2950). Hamm did not attach the five-page letter to his Reply. Hamm argues that there were "many things that [he] needed to discuss before [his] brief was filed." (R. 314-2 at Page ID 2890). According to Hamm, his "research" would have been "a remarkable variable if it were included" in his appellate brief, particularly when he was "responsible" for the citation to *Swiney* during his first appeal. (*Id*.). Hamm also argues that his "right to a direct appeal" was denied by his attorney's lack of communication and that he was therefore "forced" to "put claims in this [§ 2255] motion that by law should've been raised on my direct." (R. 321 at Page ID 2950).

As a general matter, the decision of whether to file a notice of appeal is a defendant's choice. "[T]he accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or *take an appeal*." *Jones v. Barnes*, 463 U.S. 745, 751 (1983) (emphasis added) (citations omitted). The Supreme Court has more recently noted that "filing a notice of appeal is, generally speaking, a simple, nonsubstantive act that is within the defendant's prerogative." *Garza v. Idaho*, 586 U.S. ----, 139 S. Ct. 738, 746 (2019); *see McCoy*, 584 U.S. at 421-22. Notably, Hamm is not arguing

17

that he wanted to *forego* an appeal; instead, he is arguing that he did not have sufficient opportunity to choose the grounds that should have been raised on appeal from the second trial. This claim fails for three reasons.

First, Hamm has failed to substantiate his claim that he was unaware of the appeal or that his counsel never consulted him. Consider Hamm's allegations concerning his communication with Attorney Darling. Hamm informs that he called Attorney Darling's office about fourteen months after his sentencing. Hamm was sentenced on November 29, 2021 (*see* R. 276), which places his phone call around late January or early February of 2023. Hamm then informs he received a letter from Attorney Darling two days after the phone call, which letter informed him that his second appeal had concluded. However, Hamm's second appeal did not conclude until May 4, 2023, at least two months after his alleged call to Attorney Darling. (*See* R. 310). Indeed, the single-page letter Hamm attaches to his § 2255 Motion is dated for May 26, 2023. (*See* R. 314-2 at Page ID 2888). Hamm later claims that the letter he received from Attorney Darling was actually five pages but did not attach the other pages to his filing. The single-page letter that is before the Court informs Hamm that the Sixth Circuit affirmed his conviction, that Hamm's only remaining appellate step would be to seek review by the United States Supreme Court, that it is highly unlikely that the Supreme Court would grant certiorari, and that if Hamm wishes to proceed with that course of action he should contact the prison's legal department immediately. (*Id.*). That Attorney Darling mailed this letter to Hamm at the conclusion of the second appeal does nothing to demonstrate that Hamm was unaware of the appeal or that his counsel did not consult him during the course of the second appeal. Given the inconsistencies in his allegations, Hamm has not demonstrated by a preponderance of the evidence that he was unaware of his appeal, or that Attorney Darling did not consult with him.

Second, Hamm has failed to demonstrate that his counsel's alleged failure was constitutionally deficient. "While the accused has the ultimate authority to decide whether to take an appeal, the choice of what specific arguments to make within that appeal belong to appellant counsel." *Garza*, 139 S. Ct. at 746 (internal quotations omitted); *see Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("In *Jones v. Barnes*, we held that appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."); *see also United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990) (noting that strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel"). Indeed, "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones*, 463 U.S. at 751-52). In other words, "only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Robbins*, 528 U.S. at 288 (quotations omitted); *see Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002).

Here, Hamm has not articulated the arguments that he asserts his counsel should have raised on appeal. Rather, Hamm makes a vague reference to "many things" that he needed to address with Attorney Darling before the appellate brief was filed. (R. 314-2 at Page ID 2890). In addition, Hamm argues generally that his "research" would have proved useful if it were included, yet he does not include a citation to that research or even a description of the principles discussed therein. (*Id.*). Hamm bears the burden to prove his grounds for relief by a preponderance of the evidence. *See Pough*, 442 F.3d at 964. And the Rules Governing Section 2255 Proceedings require the movant to "specify all the grounds for relief available to the moving party" and to "state

the facts supporting each ground."  Thus, to prevail on a claim of ineffective assistance of counsel, Hamm must "articulate how [Attorney Darling's] actions specifically were deficient [and] how they specifically prejudiced the outcome of the case."  *Thomas v. United States*, 849 F.3d 669, 679 (6th Cir. 2017).  Hamm's vague references do not provide the Court with a sufficient basis to determine whether counsel's choice of issues on appeal amounted to constitutionally deficient performance.  *See Garcia-Medina v. McKee*, No. 1:09-CV-36, 2014 WL 1255960, at *21-22 (W.D. Mich. Mar. 26, 2014) (rejecting § 2254 petitioner's claim that appellant counsel was ineffective for failing to consult with petitioner, noting "Petitioner fail[ed] to identify any issues that he believes should have been presented to the appellate court, but were not").

Third, Hamm has failed to demonstrate prejudice from any alleged attorney error.  To do so, Hamm must show a reasonable probability that, but for his counsel's unreasonable failure to raise certain issues on appeal, he would have prevailed on his second appeal.  *Strickland*, 466 U.S. at 694.  As noted previously, Hamm has not articulated the arguments that he asserts his counsel should have raised on his second appeal.  Indeed, given the limited scope of the second trial, the universe of potentially appealable issues was likely smaller than that of the first trial, save for issues that are inherent in every jury trial (e.g., evidentiary rulings), none of which Hamm has articulated in support of his claim that his counsel failed to raise certain issues on appeal of the second trial.

In turn, Hamm has failed to demonstrate a reasonable probability that the outcome of his second appeal would have been different had his counsel raised those arguments.  Hamm counters that he was prejudiced from his counsel's failure to raise certain issues on appeal because those claims "by law" should have been raised on direct appeal and now he is "forced" to raise those issues on collateral review which is subject to a higher standard.  (R. 321 at Page ID 2950).  Yet

Hamm's ineffective assistance claims could not have been raised on direct appeal, as litigants are generally prevented from raising claims of ineffective assistance of counsel on direct appeal. *See United States v. Sullivan*, 431 F.3d 976, 986 (6th Cir. 2005). In any event, Hamm is simply rephrasing his argument that Attorney Darling did not raise on appeal the issues Hamm would have preferred. As noted previously, counsel is not required to raise every nonfrivolous argument on appeal and determining which issues to pursue on appeal is "properly left to the sound professional judgment of counsel." *Perry*, 908 F.2d at 59. Put simply, Hamm has failed to carry his burden and he is not entitled to relief on his first ground.

### 2.    Ground Two – Fourth Amendment Violation

In his second ground for relief, Hamm claims that on the night of his arrest, officers with the Montgomery County Sheriff's Department violated his Fourth Amendment rights when they forcibly entered his residence without a warrant and under the auspices of a "welfare check." (R. 314 at Page ID 2877). This argument fails because Hamm did not raise the suppression issue on direct appeal, and therefore the argument is procedurally defaulted. To the extent Hamm is asserting a standalone claim of ineffective assistance regarding his counsel's failure to file a motion to suppress, that claim also fails. Each reason will be addressed in turn.

### a.    Procedural Default

A § 2255 motion "is not a substitute for direct appeal, and thus a defendant cannot use it to circumvent the direct appeal process." *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003). The doctrine of procedural default bars "claims that could have been raised on direct appeal, but were not[.]" *Ray v. United States*, 721 F.3d 758, 761 (6th Cir. 2013). Procedurally defaulted claims can be addressed in a § 2255 motion only if the defendant demonstrates: "(1) cause and prejudice to excuse his failure to raise the claims previously; or (2) that he is 'actually

innocent' of the crime." *Id.* (quoting *Bousley v. United States*, 523 U.S. 614, 622 (1998)); *see, e.g.*, *Peveler v. United States*, 269 F.3d 693, 698-99 (6th Cir. 2001) (affirming district court's denial of § 2255 claim asserting due process violation because it was not raised on direct appeal).

Here, Hamm did not raise the suppression issue on either direct appeal. His failure to do so renders the argument procedurally defaulted. Hamm claims that "[t]he reason [the motion to suppress] wasn't brought up pretrial falls back onto the ineffectiveness of [his] attorney." (R. 314-2 at Page ID 2890). According to Hamm, his counsel's "belief was that Judge Wier wouldn't agree with [Hamm's] point, so it was pointless to file a suppression [motion]." (*Id.*).[8] The Court understands Hamm to be arguing that his trial counsel's failure to file a motion to suppress constitutes cause for Hamm's failure to raise the issue on direct appeal thus excusing the procedural default. Indeed, ineffective assistance of counsel can constitute "cause" for a procedural default. *Wallace v. United States*, 43 F.4th 595, 602 (6th Cir. 2022).

However, Hamm's conclusory assertion is insufficient. The Sixth Circuit in *Elzy v. United States*, 205 F.3d 882 (6th Cir. 2000) considered a similar argument. There, the defendant had procedurally defaulted his claim that the federal government breached the plea agreement. *See id.* at 884. The defendant argued that "counsel's failure to raise the issue either at sentencing or on direct appeal constitutes ineffective assistance of counsel and demonstrates both cause and prejudice" to excuse the procedural default. *Id.* at 886. The Sixth Circuit determined that the defendant's "conclusory statement" was "wholly insufficient" to raise ineffective assistance of counsel and excuse the procedural default. *Id.* Like in *Elzy*, Hamm's conclusory statement that

---

[8] Then United States Magistrate Judge Robert Wier was assigned to the Hamm and Shields matter to oversee pretrial proceedings. Pursuant to the Standing Referral Order (R. 13) and consistent with 28 U.S.C. § 636(b)(1), the assigned Magistrate Judge was to make a recommended disposition concerning any pretrial matter that disposes of a charge or defense, including motions to suppress. (*See, e.g.*, R. 50) (Recommended Disposition concerning Shields' Motion to Suppress).

the reason the suppression issue was not raised pretrial was due to the ineffectiveness of his attorney is insufficient to demonstrate ineffective assistance of counsel and, in turn, insufficient to demonstrate cause to excuse his failure to raise that claim on direct appeal. Therefore, Hamm has procedurally defaulted his second ground for relief.[9]

### b.    Failure to File Motion to Suppress

To the extent Hamm is asserting a standalone claim of ineffective assistance for his counsel's failure to file a motion to suppress, that claim fails. To successfully allege ineffectiveness for failing to file a motion to suppress, the motion must be "plainly meritorious." *Hendrix v. Palmer*, 893 F.3d 906, 922 (6th Cir. 2018) (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 383 (1986)). That is, the meritorious nature of the motion must be so plain that "no competent attorney would think a motion to suppress would have failed." *Premo v. Moore*, 562 U.S. 115, 124 (2011); *see Hendrix*, 893 F.3d at 922 (finding counsel's decision to forego a motion to suppress was unreasonable because the meritorious nature of the motion to suppress was "clear from blackletter law"). In addition, to demonstrate prejudice in this context, a defendant must prove "that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Ray*, 721 F.3d at 762 (quoting *Kimmelman*, 477 U.S. at 375).

---

[9] Procedural default is not a jurisdictional bar to merits review, and it is permissible for courts to raise the issue *sua sponte* in order to protect the finality of criminal judgments and to promote judicial economy and the orderly administration of justice. *See Elzy v. United States*, 205 F.3d 882, 886-87 (6th Cir. 2000). While the Sixth Circuit has cautioned against raising procedural default *sua sponte* as a matter of course, the main concern with courts raising procedural default *sua sponte* is "that a petitioner not be disadvantaged without having had an opportunity to respond." *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005). That concern can be mitigated where, as here, a movant is put on notice of the procedural default and receives an opportunity to be heard via a period to file objections. *See Nassiri v. Mackie*, No. 19-1025, 2020 WL 4282159, at *3 (6th Cir. July 27, 2020) ("The district court here gave Nassiri his due opportunity to be heard, via his objection to the magistrate judge's R&R."); *Dean v. Beckstrom*, No. 13-129, 2014 WL 5460830, at *7 n.4 (E.D. Ky. Oct. 27, 2014).

Here, Hamm has failed to demonstrate that a motion to suppress was plainly meritorious, or that there is a reasonable probability that the verdict would have been different absent the excludable evidence. The Court will first address the merits of Hamm's suppression argument, and then address whether the exclusion of the evidence would have affected the outcome of trial.

The Fourth Amendment protects "[t]he right of the people to be secure in their person, houses, papers, and effects against unreasonable searches and seizures. . . ." U.S. Const., Amend. IV. The general rule is that warrantless searches and seizures are *per se* unreasonable. *See Katz v. United States*, 389 U.S. 347, 357 (1967). The United States concedes that officers forcibly entered the residence without a warrant on the night of Hamm's arrest. (*See* R. 319 at Page ID 2917). However, the United States argues that the officers were permitted to enter the home without a warrant due to "exigent circumstances," specifically the medical emergency that was the unprecedented number of overdoses in the area and in such a short time frame. (*Id*. at Page ID 2917-18).

"[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978). "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). That is, law enforcement "may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id*. "This 'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises. It requires only 'an objectively reasonable basis for believing' that 'a person within [the house] is in need of immediate

aid.'" *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (quoting *Brigham City*, 547 U.S. at 404-06 and then *Mincey*, 437 U.S. at 392); *see United States v. Huffman*, 461 F.3d 777, 782-83 (6th Cir. 2006). In making this determination, courts consider "the totality of the circumstances and the inherent necessities of the situation at the time." *United States v. Rohrig*, 98 F.3d 1506, 1511 (6th Cir. 1996) (internal quotations omitted).

In this case, the record reveals that law enforcement entered the residence due to exigent circumstances. As the Sixth Circuit noted on appeal, "L.K.W.'s overdose was one of twelve in Montgomery County on the evening of August 24 and the early morning of August 25—an unprecedented number in such a short time." *Hamm*, 952 F.3d at 735. Armed with the knowledge that eight overdoses had already occurred in that period, law enforcement responded to a 911 call about the overdose of three more people, including L.K.W., and learned through interviews with the drug users and examination of L.K.W.'s cell phone that the drugs were obtained from Myers, whom law enforcement already knew as a local drug trafficker. (*See* R. 295 at Page ID 2198-2202, 2214, 2218). The search of L.K.W.'s phone also revealed a recent text message from Myers about someone at her location "falling out." (R. 319-1 at Page ID 2933; *see also* R. 136 at Page ID 718). Thus, in an effort to locate any other individuals who used or would use drugs obtained from Myers, law enforcement's investigation focused on Myers's residence. (*See* R. 295 at Page ID 2203). Law enforcement approached the house and announced that they needed to make contact with the people within. (*See id*.). When the occupants failed to come to the door, law enforcement breached the door and entered the residence. (*See id*.). Inside were Myers, Hamm, and his wife Jennifer. (*See id*. at Page ID 2204). In addition, officers found in plain view evidence of illicit drug use and drug trafficking including syringes, a digital scale, and controlled substances

and cutting agents. (*See id.*). Officers obtained a search warrant before conducting any further search. (*See id.*).

Under the circumstances, the officers had an objectively reasonable basis for believing that a person within Myers's house needed protection from imminent injury. *See Fisher*, 558 U.S. at 47. This basis was objectively reasonable due to the unprecedented number of overdoses in the area within such a short time frame, drug users having identified Myers as the source of the substance that resulted in several of the overdoses including L.K.W.'s death, law enforcement's preexisting knowledge of Myers as a drug trafficker in the area, and text messages from Myers indicating that a recent drug transaction had occurred between her and L.K.W. and that someone at Myers's location was potentially under the influence of that same substance. *See Brigham*, 547 U.S. at 403 (holding that "law enforcement officers may enter a home without a warrant to render emergency assistance to . . . protect an occupant from imminent injury"); *see also Stricker v. Township of Cambridge*, 710 F.3d 350, 359-60 (6th Cir. 2013) (noting "affirmative evidence that someone may be or could be hurt can [ ] contribute substantially to an objectively reasonable belief in the existence of a medical emergency"). The fact that law enforcement was not certain whether someone at Myers's location was actually about to use the same controlled substance as one of the overdose victims is of no matter. "Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." *Fisher*, 558 U.S. at 49; *Johnson v. City of Memphis*, 617 F.3d 864, 871 (6th Cir. 2010) (noting in context of emergency-aid exception to warrant requirement that "[b]ecause the 'ultimate touchstone' of the Fourth Amendment is reasonableness, certainty is not required.").

Hamm counters that the officers entered the residence under the false pretenses of a welfare check, as demonstrated by the fact that they entered with weapons drawn and without medical

personnel on the premises.  (*See* R. 321 at Page ID 2952).  Stated differently, Hamm argues that the officers entered the residence with an ulterior motive.  However, in evaluating the applicability of the emergency aid exception to the warrant requirement, the Supreme Court has "'repeatedly rejected' a subjective approach, asking only whether 'the circumstances, viewed *objectively*, justify the action.'"  *Kentucky v. King*, 563 U.S. 452, 464 (2011) (emphasis in original) (quoting *Brigham City*, 547 U.S. at 404); *see Stricker*, 710 F.3d at 360 n.2.  As noted previously, law enforcement had an objectively reasonable basis for believing that a person in Myers's residence needed protection from imminent injury.  In addition, even if Hamm's arguments render the merits *arguable*, that is insufficient under the current standard of review.  To carry his burden, Hamm must demonstrate that the meritorious nature of the motion to suppress was so "plainly meritorious" that "no competent attorney would think [it] would have failed."  *Premo*, 562 U.S. at 124; *see Hendrix*, 893 F.3d at 922.  He has not done so.  Hamm does not provide any authority for the proposition that in order to legitimately enter a residence without a warrant and under the emergency aid exception, law enforcement must holster their weapons and have medical personnel already on the premises.  In short, Hamm has failed to demonstrate that his counsel was ineffective for failing to file a motion to suppress.

Even if Hamm can demonstrate that the motion to suppress was plainly meritorious, he has failed to demonstrate a reasonable probability that the outcome of the trial would have been different absent the excludable evidence.  In fact, Hamm has not identified any physical evidence seized as a result of the search that was actually admitted at trial.  Hamm acknowledges that "[i]nside the house, items of drug paraphernalia were found and were later brought up for use against me in a court of law."  (R. 321 at Page ID 2951).  However, as the Government notes, none of the physical evidence seized from the residence was admitted at either of Hamm's trials.  (*See*

R. 319 at Page ID 2919) (citing R. 123 (witness and exhibit list for first trial) and R. 264 (witness and exhibit list for second trial)).  In addition, Hamm was not arrested based on the items located in the residence; he was arrested on outstanding unrelated warrants.  (*See* R. 319-2 at Page ID 2937).  Indeed, Hamm acknowledges that he "was taken into custody for an outstanding warrant for a civil child support obligation that [he] had failed to take responsibility of."  (R. 321 at Page ID 2951).  Thus, even if a motion to suppress was plainly meritorious based on law enforcement's warrantless entry into the residence, none of the physical evidence seized therefrom was admitted as an exhibit at Hamm's trials.

Hamm agrees in part, asserting that the Government's argument "is only partially factual." (*Id*. at Page ID 2953).  While the items were not admitted as exhibits for physical display, Hamm argues that they were "described in great and specific detail" and "to [his] knowledge" were "included in a list to be seen by the jury, identified as 'items removed from the residence.'"  (*Id*.). While neither of the exhibit lists for the two trials reflect that a list of "items removed from the residence" was provided to the jury, Agent Sullivan did testify about the items seized from the residence in considerable detail.  (*See* R. 295 at Page ID 2204-10; *see also* R. 319-1 at Page ID 2934).  The Fourth Amendment and its exclusionary rule can apply to testimony about observations made during an illegal search.  *See Wong Sun v. United States*, 371 U.S. 471, 485-86 (1963); *United States v. Ceccolini*, 435 U.S. 268 (1978); *United States v. Akridge*, 346 F.3d 618, 624 (6th Cir. 2003).  Regardless, even without Agent Sullivan's testimony concerning the items seized from the residence, there was still considerable evidence produced at trial demonstrating Hamm's guilt.  Recall the testimony from Hamm's wife, Jennifer, that the group had regularly purchased fentanyl from Shields and transported it back to Myers.  In addition, recall the video evidence confirming that the group purchased fentanyl from Shields on or around the date of

L.K.W.'s overdose.  Most importantly, recall Agent Sullivan's testimony about Hamm's own admissions to purchasing fentanyl from Shields on behalf of Myers and providing drugs to Myers. Put simply, Hamm has failed to demonstrate a reasonable probability that, absent the testimony about the items seized from the residence, the verdict would have been different.  Therefore, Hamm's second ground for relief fails.

### 3.    Ground Three – Evidentiary Issue

In his third ground for relief, Hamm claims the prosecution presented evidence at the first trial concerning three controlled buys that did not involve Hamm and that occurred outside the date range alleged in the Third Superseding Indictment.  (*See* R. 314-2 at Page ID 314-2).  Hamm argues that the evidence "swayed the jury to unrightfully believe that those were in fact drugs obtained from me or my co-defendant."  (*Id*.).  "In reality," Hamm continues, "neither of us had any connection to those drugs or the controlled buys that captured them."  (*Id*.).

For context, Count 1 of the Third Superseding Indictment charged Shields, Hamm, and Jennifer with conspiracy to distribute carfentanil, fentanyl, and heroin, which conspiracy was alleged to have begun "[o]n or about a date in August 2016, the exact date unknown," and continue "through on or about August 27, 2016."  (R. 86 at Page ID 430).  Ralph Charles, a detective with the Montgomery County Sheriff's Office, testified at the first trial that Myers was under surveillance in August 2016 because of her suspected trafficking in narcotics.  (R. 136 at Page ID 713-14).  As a part of that investigation, officers conducted three controlled purchases from Myers and her accomplice, Bobbie Sue Hall.  (*See id*.).  The transactions took place on August 4, 2016, August 18, 2016, and August 23, 2016.  (*See id*. at Page ID 714-16).  Edward Erisman, a DEA

chemist, testified that he tested three bags of drugs and detected fentanyl, heroin, and carfentanil. (*See* R. 137 at Page ID 901-03).[10]

Hamm's argument fails for two reasons. First, Hamm failed to raise the evidentiary issue on direct appeal, and it is therefore procedurally defaulted. Second, Hamm's arguments lack merit. Each reason will be addressed in turn.

### a.     Procedural Default

First, the evidentiary issue has been procedurally defaulted as Hamm did not raise it on direct appeal. *Ray*, 721 F.3d at 761. To be sure, Hamm has alleged separate claims of ineffective assistance of counsel—that Attorney Darling conceded guilt at trial and that Attorney Darling failed to raise certain arguments on appeal of the second trial. And as noted previously, ineffective assistance of counsel can constitute "cause" for a procedural default. *Wallace*, 43 F.4th at 602. But neither ineffective assistance claim constitutes cause under the circumstances. With respect to Hamm's claim that his counsel was ineffective for conceding guilt at trial, Hamm has not linked that alleged failure to the procedurally defaulted claim he now seeks to bring—that the prosecution admitted irrelevant evidence. *See, e.g.*, *United States v. McCoy*, No. 5:08-CR-135-KKC-HAI-2, 2016 WL 1248743, at *2 (E.D. Ky. Mar. 29, 2016) ("In order for Defendant to avoid having his sufficiency claims procedurally defaulted, he must demonstrate that he received ineffective assistance from his appellate counsel *related to those claims*.") (emphasis added). In any event, Hamm's claim that his counsel provided ineffective assistance by conceding guilt at trial lacks

---

[10] During closing argument, the Government "linked Charles's and Erisman's testimony" by asserting that the drugs tested by Erisman were the same drugs obtained from the controlled buys involving Myers, even though Erisman "said nothing to connect the drugs to Myers." *Hamm*, 952 F.3d at 740. Hamm challenged the Government's closing argument on appeal. *See id.* at 740-41. The Circuit concluded the four factors that apply to improper prosecutorial statements weighed against finding a plain error. *Id.*

merit, as discussed previously.  Therefore, it cannot serve to excuse Hamm's failure to raise the evidentiary issue on appeal.

Hamm's other claim of ineffective assistance of counsel—that Attorney Darling failed to raise certain issues on direct appeal from the second trial—appears to allege an excuse for Hamm's procedural default of the evidentiary issue he now seeks to bring.  *See, e.g.*, *United States v. Bellamy*, No. 2:17-cr-1-DLB-MAS-2, 2021 WL 1921530, at *3 (E.D. Ky. Jan. 8, 2021) ("Though ineffective assistance of counsel may constitute cause excusing a procedural default, Bellamy does not allege that her counsel was ineffective for failing to file an appeal or raise these issues related to the merits of her conviction on appeal."), *adopted by*, 2021 WL 1233456 (E.D. Ky. Apr. 1, 2021).  However, the evidence Hamm takes issue with was admitted at the *first* trial.  That is, Attorney Darling's alleged failure to raise certain issues on direct appeal from the *second* trial does not excuse Hamm's failure to raise the present claim on direct appeal from the *first* trial.  Notably, Hamm has not alleged that counsel on direct appeal of the first trial, Mr. Losavio, was ineffective for failing to raise the issue.  Indeed, Hamm acknowledges that he and Mr. Losavio "frequently discussed his case," "shared our information and decided on what should be filed in [the] brief." (R. 321 at Page ID 2949).  Rather, Hamm's ineffective assistance claim only challenges Attorney Darling's decision to forego certain issues on direct appeal from the *second* trial.  In other words, even if Attorney Darling failed to raise certain issues on direct of appeal of the second trial, that attorney error does not excuse Hamm's failure to raise the present issue on direct appeal of the *first* trial.  In addition, Hamm's claim that Attorney Darling failed to raise certain issues on direct appeal of the second trial lacks merit, as previously discussed.  Therefore, Hamm's third ground for relief has been procedurally defaulted.  Like the previous procedural-default analysis, the

objection period to this Report and Recommendation provides Hamm a sufficient opportunity to be heard on that issue. *Nassiri*, 2020 WL 4282159, at *3; *Dean*, 2014 WL 5460830, at *7 n.4.

### b.    Merits

Even if Hamm has demonstrated cause to excuse his procedural default, his evidentiary challenge lacks merit. Hamm claims that the controlled buys occurred outside the date range alleged in the Third Superseding Indictment. But Hamm is mistaken. Count 1 of the Third Superseding Indictment charged Shields, Hamm, and Jennifer with conspiracy to distribute carfentanil, fentanyl, and heroin, which conspiracy was alleged to have begun "[o]n or about a date in August 2016, the exact date unknown," and continue "through on or about August 27, 2016." (R. 86 at Page ID 430). And as noted previously, Detective Charles testified that the controlled buys Hamm takes issue with all occurred in August 2016. (*See* R. 136 at Page ID 714-16). Even if the controlled buys occurred prior to the date range in the indictment, Hamm's claim fails. The Sixth Circuit "has upheld admitting evidence of events that took place thirty-three days and two weeks before the date on the indictment." *United States v. Houston*, 813 F.3d 282, 291 (6th Cir. 2016) (citing *United States v. Hettinger*, 242 F. App'x 287, 295 (6th Cir. 2007) and then *United States v. Manning*, 142 F.3d 336, 338-40 (6th Cir. 1998)); *see United States v. Vassar*, 346 F. App'x 17, 19-20 (6th Cir. 2009) ("Courts have found indictments . . . sufficient where they fix the end of the conspiracy and provide an approximate start date.") (citations omitted); *see also United States v. Lockhart*, No. 12-9-(4)-ART, 2013 WL 5652702, at *3 (E.D. Ky. Oct. 1, 2013) ("Where the date of the offense is not an element of the crime, 'great generality in the date allegation is acceptable.'") (quoting 1 Charles A. Wright, et al., *Federal Practice & Procedure* § 125 (4th ed.)).

Hamm also claims that he was not "connected" to the controlled buys. To be sure, the controlled buys did not directly involve Hamm or Shields; rather they involved Myers and her

accomplice, Bobbie Sue Hall.   Nonetheless, the evidence produced at trial demonstrates that Hamm was at least indirectly involved with  the controlled buys and the drugs obtained therefrom. As noted previously, law enforcement's investigation into L.K.W.'s death revealed that L.K.W. obtained the drugs that caused his overdose from Myers who, in turn, obtained the drugs from Hamm.   Indeed, in affirming that sufficient evidence existed to convict Hamm of conspiracy to distribute controlled substances, the Sixth Circuit noted that "Myers sometimes joined Hamm on his resupply trips" and that "there was evidence that Hamm tried to control Myers's sales," including an August 23 text message from Myers to one of her customers where she explained, "I want ya to try the new shit but don't let [Hamm] know . . . Cause [Hamm] is trying to get rid of his old supply first."  *Hamm*, 952 F.3d at 737 (internal quotations omitted).   Put simply, as the Government notes, "[t]he evidence from the controlled purchases was properly introduced at trial as circumstantial evidence of the existence of a conspiracy."  (R. 319 at Page ID 2921) (citing *United States v. Deitz*, 577 F.3d 672, 680 (6th Cir. 2009)).   Therefore, Hamm's third ground for relief fails.

### 4.        Ground Four – Sentencing Challenges

In his fourth ground for relief, Hamm alleges several sentencing errors.  (*See* R. 314 at Page ID 2880, 2882-83, 2891-92; *see also* R. 321 at Page ID 2958-63).  At bottom, Hamm takes issue with the Court's consideration of the § 3553(a) factors and the perceived fairness of his sentence.[11]

---

[11] For example, Hamm argues that his sentence was fueled by spite, noting that he received five additional years for obstructing justice; that he received a similar sentence to Shields despite Shields having a worse criminal history; that the Court did not properly consider his initial cooperation with the Government; that the Court did not properly consider the non-violent nature of his criminal history; that the Court did not consider his limited role in the conspiracy; and that his sentence for all three charges should have been run concurrently rather than consecutively.

This ground for relief fails for three reasons.  First, Hamm's challenges to the Court's calculations under the advisory Sentencing Guidelines are not cognizable on collateral review. Second, Hamm did not raise the alleged sentencing errors on direct appeal, nor did Hamm articulate a basis to warrant relief from the consequences of waiver; therefore, the alleged sentencing errors have been procedurally defaulted.  Third, Hamm's sentencing challenges lack merit.  Each reason will be addressed in turn.

### a.    Non-constitutional Sentencing Errors on Collateral Review

Among other sentencing challenges, Hamm lodges disagreements with the Court's application of the two-point enhancement for obstruction of justice and computation of his offense level and criminal history.  (*See* R. 314 at Page ID 2880, 2882-83, 2891-92; *see also* R. 321 at Page ID 2958-63).  Those challenges are not cognizable on collateral review under § 2255.  Section 2255 authorizes postconviction relief only when a sentence "was imposed in violation of the Constitution or laws of the United States, or . . . the court was without jurisdiction to impose such a sentence, or . . . the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack . . . ."  28 U.S.C. § 2255(a).  "Thus, § 2255 claims that do not assert a constitutional or jurisdictional error are generally cognizable only if they involve 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  *Snider v. United States*, 908 F.3d 183, 189 (6th Cir. 2018) (quoting *Davis v. United States*, 417 U.S. 333, 346 (1974)).  The Sixth Circuit, along with "every other court of appeals to have looked at the issue," has held that "a defendant cannot use a § 2255 motion to vindicate non-constitutional challenges to advisory guideline calculations."  *Id*. at 191 (denying § 2255 motion where defendant was sentenced under advisory guidelines scheme and the district court applied the 18 U.S.C. § 3553(a) factors at sentencing).  Here, the Court at sentencing applied the § 3553(a) factors, as discussed in more

detail below.  (*See* R. 297 at Page ID 2590-97).  Therefore, Hamm's challenges to the advisory Sentencing Guidelines calculations are not cognizable on collateral review.

### b.    Procedural Default

Second, Hamm did not raise any sentencing issues on direct appeal.  As determined with several of Hamm's other grounds for relief, Hamm's failure to raise the sentencing issues on direct appeal renders them waived for purposes of collateral review.  *Ray*, 721 F.3d at 761.  In addition, Hamm has not articulated a basis to warrant relief from the consequences of that waiver.  Rather, Hamm's sentencing arguments amount to "garden-variety" complaints about this Court's application of the § 3553(a) factors and general handling of the sentencing process.  *Grant v. United States*, 72 F.3d 503 (6th Cir. 1996); *United States v. Wolfe*, No. 0:16-CR-6-DLB-REW, 2018 WL 2075338, at *12 (E.D. Ky. Jan. 24, 2018).  The Sixth Circuit's discussion in *Grant* is worth excerpting:

> A brief consideration of the policy underlying collateral review demonstrates that nonconstitutional errors, such as mistakes in the application of the sentencing guidelines, will rarely, if ever, warrant relief from the consequences of waiver. Given society's substantial interest in the finality of judgments, only the most serious defects in the trial process will merit relief outside of the normal appellate system. Hence, when a federal statute, but not the Constitution, is the basis for postconviction attack, collateral relief from a defaulted claim of error is appropriate only where there has been fundamental unfairness, or what amounts to a breakdown of the trial process.
>
> Accordingly, nonconstitutional errors ordinarily are not cognizable on collateral review. Defendants must assert their claims in the ordinary course of trial and direct appeal. . . . In those rare instances where the defaulted claim is of an error not ordinarily cognizable or constitutional error, but the error is committed in a context that is so positively outrageous as to indicate a 'complete miscarriage of justice,' it seems to us that what really is being asserted is a violation of due process. Thus, as a practical matter, collateral relief does exist to vindicate rights of constitutional import that may lurk beneath otherwise garden-variety issues of statutory rights or guideline calculations.

*Id.* at 506 (internal citations omitted). None of Hamm's arguments rise to the level of a "most serious defect[ ] in the trial process," a "fundamental unfairness," a "breakdown of the trial process," or an error "so positively outrageous" to indicate "a complete miscarriage of justice." *Wolfe*, 2018 WL 2075338, at *12. Therefore, Hamm has waived his sentencing challenges.

### c.   Merits

Finally, review of the Presentence Investigation Report ("PSR") and the Sentencing Hearing demonstrates that Hamm's arguments lack merit. Prior to sentencing, the United States Probation Office prepared a PSR providing an analysis of the offense conduct, Hamm's criminal history and personal background, and sentencing options. For purposes of Sentencing Guidelines calculations, Counts 1, 2, and 3 were grouped pursuant to United States Sentencing Guidelines ("USSG") § 3D1.2(d). (R. 308 at Page ID 2813, ¶ 21). The probation officer calculated a Total Offense Level of 40, given a base offense level of 38 pursuant to USSG § 2D1.1(a)(2), increased by 2 levels per § 3C1.1 for obstruction of justice. (*See id.* at Page ID 2813-14, ¶¶ 22-30). The probation officer determined Hamm had a criminal history category of V because he had 12 criminal history points. (*See id.* at Page ID 2819, ¶¶ 48-50). With a Total Offense Level of 40 and a criminal history category of V, the Sentencing Guidelines recommended range was 360 months to life for Count 2, and 240 months for Counts 1 and 3 (due to a statutory maximum of 20 years). (*See id.* at Page ID 2822, ¶ 66).

At sentencing, the Court first addressed the application of the two-point enhancement for Hamm's alleged obstruction of justice. (*See* R. 297 at Page ID 2540). Agent Sullivan testified that between November 2020 and the second trial in August 2021, Hamm made upwards of 20 to 30 recorded jail calls to several witnesses and tried to convince them not to testify at the second trial or to testify that they had forgotten relevant information. (*See id.* at Page ID 2545-53). When

making the calls, Hamm often used other inmates' accounts in an effort to prevent the Government from listening in.  (*See id*.).  Hamm would call the witnesses directly or call his father and recruit him to contact the witnesses on his behalf.  (*See id*.).  Based on the evidence presented at trial and at the sentencing hearing, Attorney Darling determined that an objection to the two-level enhancement for obstruction of justice would have been "frivolous."  (*Id*. at Page ID 2567).  The Court adopted the Sentencing Guidelines calculations in the PSR, finding that based on Hamm's conduct, the two-level enhancement for obstruction of justice "properly applied."  (*Id*. at Page ID 2568-70).

Next, the Court considered the § 3553(a) factors, including the circumstances of the offense, Hamm's history and characteristics, the seriousness of the offense, rehabilitative measures, and sentencing disparities.  (*See id*. at Page ID 2590-97).  The Court acknowledged the 480-month starting point at Hamm's first sentencing and that Hamm had received a 60-month downward variance to his first sentence based on his initial cooperation with the Government.  (*See id*. at Page ID 2592-95; *see also id*. at Page ID 2575-76).  The Court informed that it was starting at the same 480-month benchmark for the second sentence.  (*See id*. at Page ID 2592).  The Court agreed that Hamm would not automatically lose the benefit of the 60-month variance.  (*See id*. at Page ID 2594).  Instead, the Court determined that Hamm's conduct in the case effectively rendered any benefit from his cooperation a wash:

> So I do believe that he should receive the benefit from his early cooperation, I don't believe he should lose that.
> . . . .
> However, based upon his conduct in the case, I also believe that effectively he loses that cooperation based on the obstruction, and I agree with the United States in its calculations as to how that should be measured.  It's effectively a wash.  What he gains through a reduction for cooperation he loses through the obstructive conduct.

(*Id.* at Page ID 2594-95; *see also id.* at Page ID 2587-2588).  The Court ultimately sentenced Hamm to a total term of imprisonment of 480 months.  (*See id.* at Page ID 2597-98).  The Court imposed a 360-month imprisonment term on Count 2.  As for Counts 1 and 3, the Court imposed a 240-month imprisonment term on each, "but running those partially concurrent and partially consecutive, 120 months to run consecutive," to produce "a total term of 480 months."  (*Id.*).

Hamm argues that his sentence constitutes cruel and unusual punishment and was fueled by spite, as evidenced by the fact that he received five additional years for obstructing justice and that he received a similar sentence to Shields despite Shields having a considerably worse criminal history.  As demonstrated previously, the additional term of imprisonment was imposed due to Hamm's pervasive obstruction of justice leading up to the second trial.  And Hamm fails to acknowledge that the Court expressly discussed the differences in Shields's and Hamm's criminal histories and the reason for any similarity in their sentences:

> And there were some other factors that would give rise to Mr. Shields receiving a higher sentence than Mr. Hamm, primarily when we look at the nature of criminal history. And as Mr. Darling correctly points out, Mr. Shields and Mr. Hamm have the same number of criminal history points but they get to those points differently, quite a bit differently. With Mr. Shields having a number of felony drug convictions, and as we discussed at his sentencing earlier, some would, I believe, qualify as serious felony drug convictions.
>
> Why is that important? That's important because of the fact that Mr. Shields throughout his entire life has been engaged in drug trafficking activities, even as a child. He's not worked. He's engaged in this type of conduct to live, and he apparently was pretty successful until he was arrested in this particular case, and now he's been sentenced to a term of incarceration of 480 months.
>
> Mr. Hamm on the other hand received the benefit of a reduction from that starting point, that 480-month starting point, down to 420 months at the original sentencing. But then he's engaged in conduct that has really put him on par with Mr. Shields in many respects. Shields did not attempt to obstruct justice, Mr. Hamm did, and he did so in a very significant way.

(R. 297 at Page ID 2592-93).

Hamm argues that the Court did not properly consider his initial cooperation with the Government in assisting the arrest of Shields. Again, Hamm fails to acknowledge the sentencing Court's express consideration of the issue. The Court agreed with Hamm that he still deserved a 60-month downward variance for his cooperation. (*See* R. 297 at Page ID 2594-95). However, the Court found that Hamm's obstructive conduct warranted a 60-month enhancement, thereby effectively undoing the benefit Hamm received from his cooperation. (*See id.*).

Hamm argues that consecutive sentences are unlawful. However, federal law expressly allows courts to impose concurrent or consecutive sentences. *See* 18 U.S.C. § 3584 ("If multiple terms of imprisonment are imposed on a defendant at the same time, . . . the terms may run concurrently or consecutively. . . ."). In addition, Hamm has failed to demonstrate that the Court abused its discretion in ordering his sentence to partially run consecutively. "The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a)." § 3584(b). As noted previously, the sentencing court addressed the factors under § 3553(a). Whether the sentencing court expressly mentioned the basis for the consecutive/concurrent determination is of no matter. The Sixth Circuit has found that "[r]equiring district courts to conduct a separate Section 3553(a) analysis for the concurrent or consecutive nature of the sentence would be repetitious and unwarranted," and held that "district courts have no such distinct obligation." *United States v. Berry*, 565 F.3d 332, 343 (6th Cir. 2009); *see also United States v. Johnson*, 640 F.3d 195, 208 (6th Cir. 2011); *United States v. King*, 914 F.3d 1021, 1026 (6th Cir. 2019).

Hamm argues that his offense level was unfairly increased based solely on the actions of his co-conspirators, while the facts established at trial demonstrate that he was directly responsible

for only one of the distribution counts.  In support of this argument, Hamm cites *United States v. Romano*, 970 F.2d 164 (6th Cir. 1992), and *United States v. Wilson*, 920 F.2d 1290 (6th Cir. 1990).  But *Romano* and *Wilson* are not helpful to Hamm.

In *Romano*, the defendant received a four-level increase in his base sentence for his aggravating role pursuant to USSG § 3B1.1(a) and a two level increase for the degree of planning involved pursuant to USSG § 2F1.1(b)(2).  *See* 970 F.2d at 166.  He argued that because minimal planning is necessarily required to be an organizer or leader of a criminal activity involving five or more persons, he should not have received an enhancement under both sections.  *See id*.  The Sixth Circuit agreed, holding that "if certain conduct is used to enhance a defendant's sentence under one enhancement provision, the defendant should not be penalized for that same conduct again under a separate provision whether or not the Guidelines expressly prohibit taking the same conduct into consideration under two separate provisions."  *Id*. at 167.  Hamm did not receive enhancements under either of those provisions and has not pointed to any portion of his sentencing that constitutes the type of improper "double counting" that the Circuit addressed in *Romano*.  In addition, a 1993 amendment to the Sentencing Guidelines has abrogated the holding of *Romano*. *See United States v. Cobleigh*, 75 F.3d 242, 251 (6th Cir. 1996); *United States v. Smith*, 196 F.3d 676, 681 (6th Cir. 1999).

In *Wilson*, the defendant pleaded guilty to six counts of using an interstate commerce facility in an attempt to have his wife killed in violation of 18 U.S.C. § 1958, the Federal Murder-For-Hire statute.  *See* 920 F.2d at 1291.  The defendant appealed his sentence, arguing that the district court used the wrong offense guideline for sentencing purposes, that grouping of the six counts for the purpose of sentence calculation was required by USSG §§ 3D1.2(a) or 3D1.2(b), and that the district court failed to make the requisite findings concerning disputed facts during the

sentencing process. *See Romano*, 920 F.2d at 1292. The Sixth Circuit rejected two of the arguments, but agreed with the defendant that the counts should have been grouped. *See id*. at 1293-94. Beyond mere citation to *Wilson*, Hamm does not explain how that holding has any bearing on his present argument or his sentencing generally. And unlike the defendant in *Wilson*, Hamm's three counts were grouped for purposes of sentencing pursuant to USSG § 3D1.2(d).

Hamm ultimately concedes that "while the calculations were in fact done in accordance with law, I feel that common sense must still be applied to determine whether or not a sentence is too severe for a person's role in a crime." (R. 314-2 at Page ID 2892). As noted previously, the record demonstrates Hamm's sentence was imposed after proper consideration of the § 3553(a) factors. In short, Hamm's fourth ground for relief fails.

### 5.    Ground Five – Jury Instruction at the Second Trial

Next, Hamm argues the jury was improperly instructed at the second trial. (*See* R. 314 at Page ID 2881). Hamm states, "I was granted a new trial solely on the death enhancement. However, at the reading of the jury instructions, the judge told the jury I was already guilty of the charge they were deciding." (*Id*.; *see also id*. at Page ID 2892 ("However, when the jury instructions were being read, the judge informed the jury I was already convicted of the crime that they were supposed to be considering.")). Hamm reiterates this ground for relief in his Reply. (*See* R. 321 at Page ID 2956-57) ("For them to be instructed that I was guilty of the very crime they are there to decide, there is obviously no other verdict that could've been given other than guilty.").

It is not clear from Hamm's filings, but he seems to be challenging one or all of the following instructions: the Statement of the Case provided to the jury during voir dire (hereinafter "Statement of the Case"), a preliminary statement provided to the jury before formal instruction

(hereinafter "Preliminary Statement"), Jury Instruction No. 13, and Jury Instruction No. 25. Each of these will be reviewed.

In preparation for the second trial, the Court ordered the parties to submit a statement of the case that identified the primary issues raised by the parties. (R. 215 at Page ID 1810, ¶ 9). The parties submitted separate Statements (*see* R. 243; R. 246; R. 248) and were heard on their respective positions during two pretrial conferences (*see* R. 293; R. 294). The Court adopted the following Statement of the Case:

> Let me begin by telling you about this matter that's scheduled for trial today. In an earlier trial, defendants Robert Lee Shields and Wesley Scott Hamm were convicted of three federal drug crimes which occurred in 2016 in Montgomery County, Kentucky, and elsewhere. Those convictions included the following: Count 1, for conspiring to distribute heroin, fentanyl and carfentanil from a date in 2016 until on or about August 27th, 2016. Count 2, for distributing carfentanil on or about August 24th, 2016. And Count 3, for distributing carfentanil on or about August 27th, 2016. Now, in this trial the jury will be asked to answer certain questions pertaining only to Count 2. Now, proof presented during the earlier trial included evidence that an individual -- that Tracey Myers, another individual involved in the criminal activity charged in this case, distributed carfentanil, a Schedule II controlled substance, to multiple individuals in Montgomery County in August of 2016. Now, several persons overdosed after using the drug and one person, [L.K.W.], died. In this trial, the jury will be asked to determine whether one or both of the defendants were in the chain of distribution to [L.K.W.]. The defendants deny that they were in the chain of distribution of the carfentanil that caused the death of [L.K.W.]. Instead, they maintain that the carfentanil distributed by Myers to [L.K.W.] came from a source of supply other than the defendants.

(R. 302 at Page ID 2620-21). The Statement of the Case was provided to the jury at the beginning of voir dire. (*See id*.).

Prior to providing the jury with formal instructions, the Court gave the jury the following Preliminary Statement:

> I will begin this morning, ladies and gentlemen, with the jury instructions in the case. Before I provide you with jury instructions to put this matter in context, I'll read the charge, Count 2, original charge in this matter.

Count 2 alleges that on or about August 24th, 2016, in Montgomery County, in the Eastern District of Kentucky, Robert Lee Shields, also known as Sosa, and Wesley Scott Hamm did knowingly and intentionally distribute a mixture or substance containing a detectable amount of carfentanil, a Schedule II controlled substance, the use of which resulted in the overdose death of an individual identified by the initials L.K.W., all in violation of Title 21 of the United States Code, Section 841(a)(1).

(R. 303 at Page ID 2678).

Next, in relevant part, Jury Instruction No. 13 provided,

The defendants' convictions for distribution of carfentanil are subject to enhancement if you find that the government has provide beyond a reasonable doubt that the defendants were part of the distribution chain that placed the carfentanil into the hands of [L.K.W.] that resulted in his death.
. . . .

Now, this enhancement may not be applied based solely on the actions of Tracey Myers. For the government to prove this sentencing enhancement, it must prove to you beyond a reasonable doubt that the carfentanil Myers distributed to [L.K.W] was the same carfentanil that was distributed by Defendants Shields and Hamm on or about August 24, 2016.

(*Id*. at Page ID 2687-88).

Jury Instruction No. 25, titled "Judicial Notice," provided,

Now, I have decided to accept as proven the fact that the defendants were convicted of three federal drug crimes, even though no evidence was presented on this point. Those crimes include the following:

Count 1: Conspiracy to distribute heroin, fentanyl and carfentanil from August 2016, the exact date unknown, until August 27, 2016, in Montgomery County, Kentucky and elsewhere.

Count 2: Distribution of carfentanil on or about August 24, 2016, in Montgomery County, Kentucky.

And Count 3: Distribution of carfentanil on or about August 27, 2016, in Montgomery County, Kentucky.

You may accept these facts as true, but you are not required to do so.

(*Id*. at Page ID 2693-94).

43

Hamm's challenge fails for two reasons.  First, Hamm is precluded from raising the issue on collateral review.  Second, the ground for relief lacks merit.  Each reason will be addressed in turn.

### a.    Attempt at Relitigation or Procedural Default

Hamm is precluded from raising the issue on collateral review because he either raised it on direct appeal and it was decided adversely to him, or he failed to raise it on direct appeal and therefore waived it.  As discussed previously, it is "well settled that an argument not raised on direct appeal is waived." *Wright v. United States*, 182 F.3d 458, 467 (6th Cir. 1999) (citing *Grant*, 72 F.3d at 505-06).  "It is equally well settled that a § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as in intervening change in the law." *Id*. (citing *Oliver v. United States*, 90 F.3d 177, 180 (6th Cir. 1996) and then *DuPont v. United States*, 76 F.3d 108, 110-11 (6th Cir. 1996)).

On direct appeal from the second trial, Hamm argued that Jury Instruction No. 13 misstated the law, specifically, that "the district court was required to explain that [his] underlying distribution conviction[ ] w[as] predicated on Myers's distribution under the *Pinkerton* doctrine." *Hamm*, 2023 WL 3244975, at *4.  The Sixth Circuit found that case law did not require the district court "to include a *Pinkerton* explanation, particularly where the only issue left for the jury to decide was whether to apply the death-or-injury enhancement to the underlying distribution convictions." *Id*. at *5.  Thus, the Circuit concluded that "Jury Instruction No. 13 was an accurate statement of the law." *Id*.  Therefore, to the extent Hamm's present challenge takes issue with Jury Instruction No. 13, he is precluded from relitigating that argument in a § 2255 motion. *Wright*,

182 F.3d at 467.  In addition, Hamm has not identified any highly exceptional circumstances that would permit him to relitigate the issue.

To the extent Hamm's current challenge takes issue with the Statement of the Case, the Preliminary Statement, or Jury Instruction No. 25, he is still precluded from raising the argument in his § 2255 motion.  Hamm failed to raise those challenges on direct appeal.  His failure renders the arguments waived for purposes of collateral review.  *Ray*, 721 F.3d at 761.  Hamm counters that he did not raise his challenge on direct appeal "because as I stated earlier, I didn't know I even had an appeal lawyer yet."  (R. 314 at Page ID 2881).  Like with the third ground for relief, Hamm is attempting to use his attorney's alleged failure to raise certain issues on appeal as a basis to excuse his waiver of the current challenge.  Hamm's conclusory allegations of ineffective assistance of counsel are insufficient to excuse procedural default.  *Elzy*, 205 F.3d at 886.  In addition, Hamm's claim that his attorney failed to raise certain issues on appeal lacks merits as noted previously; therefore, it cannot operate to excuse his procedural default of the current challenges.  Thus, Hamm's fifth ground for relief has been waived.

### b.    Merits

Even if Hamm can provide a sufficient basis to excuse his waiver, his claims lack merit. For a court to grant a § 2255 movant relief based on an erroneous jury instruction, the movant must demonstrate that "the trial court's jury instructions violated 'the Constitution or laws of the United States,'" and that "the instructional error 'had a substantial and injurious effect or influence on the . . . jury's verdict.'"  *Dimora v. United States*, 973 F.3d 496, 502 (6th Cir. 2020) (quoting 28 U.S.C. § 2255 and then *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003)).  In determining the propriety of a jury instruction, the Court must look to the jury instructions as a whole.  *United States v. Frei*, 995 F.3d 561, 565 (6th Cir. 2021).

Here, Hamm has failed to demonstrate that any of the jury instructions violated the Constitution or the laws of the United States or that the instructional error had a substantial and injurious effect or influence on the jury's verdict. *Dimora*, 973 F.3d at 502. As an initial matter, the Sixth Circuit expressly held that Jury Instruction No. 13 accurately stated the law. *See Hamm*, 2023 WL 3244975, at *5. That holding precludes relief as to that jury instruction. Therefore, to the extent Hamm is challenging Jury Instruction No. 13, his fifth ground for relief fails.

Hamm's remaining challenges can be attributed to his mistaken belief that the Court instructed the jury that he had already been found guilty of the charge at issue on remand. (*See* R. 314 at Page ID 2881) ("I was granted a new trial solely on the death enhancement. However, at the reading of the jury instructions, the judge told the jury I was already guilty of the charge they were deciding."). Hamm repeats this mistaken belief several times. (*See id*. at Page ID 2892 ("However, when the jury instructions were being read, the judge informed the jury I was already convicted of the crime that they were supposed to be considering."); *see also* R. 321 at Page ID 2957 ("For them to be instructed that I was guilty of the very crime they are there to decide, there is obviously no other verdict that could've been given other than guilty.")). Despite Hamm's apparent confusion, the sole issue before the jury on remand was whether to apply the death-or-injury sentencing enhancement under § 841(b)(1)(C). *See Hamm*, 952 F.3d at 748 (remanding for "new trial on the sole issue of whether to apply the § 841(b)(1)(C) death-or-injury enhancement"). To be sure, Hamm also takes issue with the fact that the jury was informed of his prior convictions. (*See* R. 321 at Page ID 2956 ("the presiding judge disclosed to the jury that I was already convicted of distributing heroin, fentanyl, and carfentanil"); *see also id*. at Page ID 2958 ("They too were informed of all 3 of my federal charges and convictions. Two of those had no relevance to the case being decided no matter how [ ] viewed.")). Although the jury was informed of Hamm's

underlying convictions, the jury was also *repeatedly* instructed that the limited issue before it was whether Hamm was in the chain of distribution of carfentanil in Count 2 that resulted in L.K.W.'s overdose death in order to apply the sentencing enhancement under § 841(b)(1)(C).  (*See* R. 303 at Page ID 2679 ("Your second duty is to take the law that I give you, apply it to the facts, and decide if the government has proved beyond a reasonable doubt that one or both of the defendants were in the chain of distribution of the carfentanil to [L.K.W.] that resulted in his death."); *id*. at Page ID 2681 ("The government must prove this sentencing enhancement beyond a reasonable doubt."); *id*. at Page ID 2686 ("I want to emphasize that the defendants are only on trial for the particular sentencing enhancement charged in the indictment. Your job is limited to deciding whether the government has proved the sentencing enhancement.").  As the Sixth Circuit noted on appeal from the second trial, "the district court's jury instructions properly set forth the standards established in *Hamm* and *Swiney* and tasked the jury with answering only one question: whether Defendants were in the chain of distribution for the same carfentanil that led to L.K.W.'s death." *Hamm*, 2023 WL 3244975, at *6.

Putting aside Hamm's misunderstanding as to the scope of the second trial, he has not demonstrated that the instructions violate the Constitution or the laws of the United States.  As a general matter, courts are permitted to take judicial notice of a defendant's prior convictions.  *See, e.g.*, *Campbell v. United States*, No. 16-5288, 2017 WL 4046379 (6th Cir. Mar. 22, 2017) (taking judicial notice of § 2255 movant's prior convictions).  Given the Sixth Circuit's limited remand, the Hamm was precluded from relitigating the underlying convictions.  *Campbell*, 168 F.3d at 265. In other words, the underlying convictions had been affirmed by the Sixth Circuit and the Court was bound by that determination under the law-of-the-case doctrine.  *Edmonds*, 922 F.3d at 739. Accordingly, the Court informed the jury of Hamm's prior convictions consistent with the law of

the case and in order to provide necessary context to the limited decision the jury was making on remand. Viewing the jury instructions as a whole, the jury was adequately informed that the limited issue before it was whether the government proved beyond a reasonable doubt that Hamm was in the chain of distribution of the same carfentanil that resulted in L.K.W.'s overdose death in order to apply the death-or-injury enhancement pursuant to 18 U.S.C. § 841(b)(1)(C). Because the jury instructions accurately stated the law, Hamm cannot show that any instructional error had a substantial and injurious effect or influence on the jury's verdict. *Dimora*, 973 F.3d at 502. Put simply, Hamm's fifth ground for relief fails.

### 6.    Ground Six – Plea Offer

Finally, Hamm disagrees with the way in which plea negotiations occurred prior to trial. Hamm argues that he was "forced [into] trial" because he "was never given an opportunity to take a legitimate plea." (R. 314 at Page ID 2893; *see also id*. at Page ID 2882 (asserting he should have been "permitted to enter a guilty plea with just my own acceptance of responsibility")). Hamm claims that he "was only offered a plea that required [his] cooperation in the conviction of [his] co-defendants." (*Id*. at Page ID 2893; *see also id*. at Page ID 2882 ("I was never given the opportunity to take a plea agreement that only required I plead guilty and accept only my own responsibility.")). Hamm claims that his challenge is directed toward the conduct of both the prosecution and his attorney. (*See id*. at Page ID 2882 ("I'm not sure if this challenge reflects the actions of the District Attorney or my own lawyers."); *see id*. at Page ID 2893 ("I feel this may also further my claim of ineffective counsel because I now see it was his duty to discuss other plea options with the US attorney. He failed to do so.")).

Hamm vacillates between the terms "plea" and "plea agreement," making it difficult to tell whether he is complaining about the United States' unwillingness to bargain or that he wanted to

48

enter an open guilty plea and did not get to.  Either way, Hamm's claim fails.  "[T]here is no constitutional right to a plea bargain."  *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977); *accord Missouri v. Frye*, 566 U.S. 134, 148 (2012) ("a defendant has no right to be offered a plea"). Neither is there a constitutional right to a plea bargain that omits certain conditions.  *See United States v. Boykins*, Nos. 89-3580, 89-3641 and 89-3798, 915 F.2d 1573 (unpublished table decision), 1990 WL 143559, at *5 (6th Cir. Oct. 2, 1990) ("We are unaware of a legal basis for an allegation of constitutional error as a result of the government's conditional plea offer."); *see also United States v. Rucker*, 133 F. App'x 187 (6th Cir. 2005) ("A plea bargain standing alone is without constitutional significance; in itself it is a mere executory agreement which, until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally protected interest.") (quoting *Mabry v. Johnson*, 467 U.S. 504, 507 (1984)).  In particular, the United States is permitted to use plea offers conditioned on a defendant's cooperation.  *See, e.g.*, *United States v. Dillion*, 14 F. App'x 352 (6th Cir. 2001) (affirming district court's determination that defendant breached written plea agreement by failing to "fully cooperate with the United States in the further prosecution and/or investigation of the matters," including "testifying in any and all proceedings related thereto"); *United States v. Johnson*, 371 F. App'x 631, 636 (6th Cir. 2010) ("Johnson's plea was valid because he entered the plea knowing that he was subject to a sentence of up to 235 months unless the Government determined that he cooperated.").

Notably, Hamm agrees in part that plea agreements can be conditioned on cooperation. (*See* R. 321 at Page ID 2953).  He states, "The government simply argues that 'it is a valid condition in a plea agreement.' I do concur with this. However, I disagree that it should be the only way a plea may be accepted."  *Id*.  That is, Hamm takes issue with the fact that any plea offer from

the Government would be conditioned exclusively on his cooperation. Hamm argues that "[w]hile cooperation is a valid condition of a plea, it is specifically written in Chapter 6, Part B of the Sentencing Guidelines Manual that it should not be the only way a plea may be entered." (*Id*. at Page ID 2953-54). However, Hamm is misinformed. Nowhere in Chapter 6, Part B of the United States Sentencing Guidelines Manual ("USSG Manual") does it state that a plea agreement cannot be conditioned exclusively on a defendant's cooperation. In addition, Hamm fails to acknowledge that he *did* have the ability to enter an open plea; he takes issue with the fact that entering an open plea would not carry with it the potential for more lenient treatment from the Government.

Relatedly, Hamm asserts that his decision to reject the plea offer and go to trial was involuntary. (*See* R. 321 at Page ID 2954-56). Specifically, Hamm claims the Assistant United States Attorney ("AUSA") informed him that if he agreed to testify against Shields, the Government would recommend a sentence of 8-12 years, but that if he declined to testify, the Government would recommend a sentence of life in prison. (*See id*. at Page ID 2955). He states that if he were to cooperate against his co-defendant, he would be labelled a "rat" by other inmates and subjected to retaliation for his cooperation. (*See id*.). In other words, Hamm argues that his only options were (1) to reject the plea offer, go to trial, and face a potential life sentence, or (2) to cooperate with the Government in exchange for a potentially shorter sentence, but risk retaliation from his codefendants and other inmates. According to Hamm, his available options made his decision involuntary.

Although claiming that he "had no choice in the matter," Hamm acknowledges that he weighed his options and did in fact decide to proceed to trial rather than plead guilty and cooperate with the Government. (*See* R. 321 at Page ID 2955) ("I decided that at least with trial, though they are gonna give me life, it's better than the 8-12 where as someone else would give me death.").

Thus, Hamm concedes that he did in fact make the decision to reject the plea offer and proceed to trial. That concession evinces that Hamm's decision was voluntary. *See Smith v. United States*, 348 F.3d 545, 552 (6th Cir. 2003) ("Although the attorney may provide an opinion on the strength of the government's case, the likelihood of a successful defense, and the wisdom of a chosen course of action, the ultimate decision of whether to go to trial must be made by the person who will bear the ultimate consequence of a conviction.").

Furthermore, the difficulty in making a choice of whether to plead guilty or to proceed to trial does not render Hamm's ultimate decision involuntary. Having to make such "'difficult choices [is] an inevitable'—and permissible—'attribute of any legitimate system which tolerates and encourages the negotiation of pleas." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) (quoting *Chaffin v. Stynchcombe*, 412 U.S. 17, 31 (1973)). "[B]y tolerating and encouraging the negotiation of pleas, [the United States Supreme Court] has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forgo his right to plead not guilty." *Id*. This is not to say that the Government can persuade a defendant using *any* means. But, as discussed above, there is no right to a plea offer, let alone an offer that meets a defendant's expectations. And conditioning a plea offer on a defendant's cooperation does not implicate noncriminal, protected activity. *See United States v. Goodwin*, 457 U.S. 368, 372-73 (1982) ("The imposition of punishment is the very purpose of virtually all criminal proceedings. The presence of a punitive motivation, therefore, does not provide an adequate basis for distinguishing governmental action that is fully justified as a legitimate response to perceived criminal conduct from governmental action that is an impermissible response to noncriminal, protected activity."); *see United States v. O'Lear*, 90 F.4th 519, 531-32 (6th Cir. 2024), *cert. docketed*, No. 23-7132 (April 4, 2024) ("[T]he government does

not punish a defendant by offering a choice between two options (plead guilty to less serious charges or stand trial on more serious ones) so long as the defendant may voluntarily accept or reject this offer. Any other rule would interpret the Due Process Clause to bar plea deals.").   In short, Hamm has failed to demonstrate that his decision to reject the plea offer and proceed to trial was involuntary.

In a similar vein, Hamm believes he received a longer sentence because he exercised his right to proceed to trial.   "The principle of law is well established that a court may not increase a defendant's sentence in retaliation for the exercise of that constitutional right."   *United States v. Hall*, 829 F. App'x 699, 709-10 (6th Cir. 2020) (citing *Bordenkircher*, 434 U.S. at 363).   "However, while a criminal defendant 'may not be subjected to more severe punishment for exercising his constitutional right to stand trial, the mere imposition of a heavier sentence after a defendant voluntarily rejects a plea bargain does not, without more, invalidate the sentence." *Lester v. Phillips*, No. 08-13053, 2010 WL 2613082, at *9 (E.D. Mich. June 28, 2010) (citing *United States v. Morris*, 827 F.2d 1348, 1352 (9th Cir. 1987)).   Here, Hamm's second sentence was longer than his first based on Hamm's pervasive obstruction of justice leading up to the second trial, as noted previously.   And the ultimate sentence imposed (480 months) was within the applicable Sentencing Guidelines range of 360-months to life.   *See Hall*, 829 F. App'x at 710-11 (finding 444-month sentence was within the 360-months-to-life-in-prison Sentencing Guidelines range and therefore did not constitute punishment for proceeding to trial).   Therefore, Hamm's claim that he was sentenced more severely because he proceeded to trial is unfounded.

Lastly, any claim by Hamm that his counsel provided ineffective assistance in negotiating the plea offer also fails.   "Although defendants have no constitutional right to a plea offer, 'when the Government chooses to enter into plea negotiations, the Constitution requires that defendants

receive effective assistance in navigating that crucial process.'" *Gilbert v. United States*, 64 F.4th 763, 771 (6th Cir. 2023) (quoting *Rodriguez-Penton v. United States*, 905 F.3d 481, 489 (6th Cir. 2018)); *see Byrd v. Skipper*, 940 F.3d 248, 255-57 (6th Cir. 2019) ("[B]ecause there is no right to a plea offer, where a petitioner alleges ineffective assistance of counsel prevented plea negotiations, demonstrating prejudice requires that he establish a reasonable probability that but for counsel's errors, the petitioner would have received a plea offer."); *see also Carson v. United States*, 88 F.4th 633, 640 (6th Cir. 2023), *cert. docketed*, No. 23-7196 (Apr. 10, 2024) (noting that "[m]any courts have held that a defendant cannot make out an ineffective-assistance claim unless the prosecution puts a plea deal on the table," but that "our court has rejected this approach"); *United States v. Singh*, 95 F.4th 1028, 1034 (6th Cir. 2024) ("Under our precedent, defendants can show prejudice by establishing that, but for counsel's advice, it's reasonably probable they would've rejected the government's plea offer and successfully negotiated a better one.").

Here, Hamm has not identified any aspect of his counsel's conduct that was deficient in the plea negotiation process. Nor could he. "Defense counsel had no control over the terms that the government was willing to offer." *Soto v. United States*, No. 10-20635, 2019 WL 11250158, at *5 (E.D. Mich. Mar. 21, 2019) (rejecting § 2255 movant's argument that "any plea agreement offered by the government included a cooperation requirement, which [movant] was not willing to accept."). Similarly, to the extent Hamm is arguing his counsel failed to inform him that he could have entered an open plea, Hamm has failed to demonstrate a reasonable probability that he would have done so. Hamm does not identify any evidence in the record that supports his *ad hoc* assertion, and the contemporaneous evidence demonstrates otherwise. On Count 2 alone, Hamm was subject to a statutory minimum term of 20 years in prison. *See* 18 U.S.C. § 841(b)(1)(C). And Hamm admits he was expressly aware that the Government intended to seek a life sentence if he

did not agree to cooperate and acknowledges that he was unwilling to cooperate. Thus, it is unlikely that Hamm would have entered an open plea knowing that the Government would seek a life sentence and that he faced a mandatory minimum of 20 years just on Count 2. Under the circumstances, Hamm has failed to demonstrate a reasonable probability that, but for his counsel's alleged error, he would have taken an open plea. In short, Hamm's sixth ground for relief fails.

## III.    CERTIFICATE OF APPEALABILITY

Under Rule 11 of the Federal Rules Governing Section 2255 Proceedings, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate may issue only if a defendant "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court explained this requirement in *Slack v. McDaniel*, 529 U.S. 473 (2000) (addressing issuance of a certificate of appealability in the context of a habeas petition filed under 28 U.S.C. § 2254, which legal reasoning applies with equal force to motions to vacate brought under 28 U.S.C. § 2255). Where a district court rejects a petitioner's constitutional claims on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* at 484. When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a certificate of appealability should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.*

In this case, reasonable jurists would not debate the denial of Hamm's § 2255 Motion or conclude that "the issues presented are adequate to deserve encouragement to proceed further."

*Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Accordingly, it will also be recommended that a certificate of appealability be denied upon the entry of a final order in this matter.

## IV.    CONCLUSION AND RECOMMENDATIONS

For the reasons stated above, **IT IS RECOMMENDED** that:

1) Hamm's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (R. 314) **be denied;**

2) a Certificate of Appealability **be denied** in conjunction with the entry of a final order in this matter;

3) a Judgment in favor of the United States **be entered** in Hamm's ancillary action dismissing his claims and striking the ancillary action from the active docket of the Court.

The parties are directed to 28 U.S.C. § 636(b)(1) for appeal rights and mechanics concerning this Report and Recommendation, issued under subsection (B) of the statute. *See also* Rule 8(b), Rules Governing Section 2255 Proceedings for the United States District Courts. Within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to any or all findings or recommendations for determination, *de novo*, by the District Judge. Failure to make a timely objection consistent with the statute and rule may, and normally will, result in a waiver of further appeal to or review by the District Judge and Sixth Circuit Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).

Dated this 30th day of April, 2024.



Signed By:

*Candace J. Smith*

**United States Magistrate Judge**